In the Matter of the Estate of CLAUDE C. PINNEY, Deceased.

Surrogate's Court, New York County, August 22, 1935.

*Jonas & Neuburger* [*Selig Edelman* of counsel], for the objectant.

*Beekman, Bogue, Leake, Stephens & Black*, for Brooklyn Trust Company, as temporary administrator, and Brooklyn Trust Company and Charles H. George, as executors.

*Cullen & Dykman*, for Brooklyn Trust Company, as temporary administrator and as executor.

*Alfred J. Talley*, referee.

DELEHANTY, S. Objections to the account of the executors herein were referred to a referee whose report is before the court on a motion to confirm and on exceptions thereto.

The record comprises 2,243 typewritten pages of testimony and 270 exhibits. Upon the hearing of the exceptions to the referee's report objectant's counsel was granted by the court two and one-half hours for argument and expressed vigorous dissent from the direction of the court that his oral argument be then concluded. Following the argument, counsel for objectant filed a brief of 241 printed pages. In it he incorporated by reference large portions of two briefs filed by him before the referee aggregating 550 typed pages. Even in the case of an involved record and not a merely lengthy one such so-called briefs place an unwarranted burden on the court. Justice to other litigants required deferment of consideration of this issue until time was available for perusal of this record and these briefs. At the end of all the labor of reading them the court finds that the question at bar is neither involved nor unprecedented. Vain search was made through these extensive briefs and through the mass of reference therein for something which would justify this appropriation of time of the court which other litigated issues had equal right to command.

Appellate courts have refused perusal of such prolix exhibits of counsels' views and, by striking briefs from the file, have constrained counsel to keep within accepted limits. Rather than invoke a remedy so drastic this court has preferred to devote the time necessary in the reading. It notes, however, the impropriety of the practice pursued by objectant's counsel.

Deceased died June 27, 1929. He was then the owner of a membership in the New York Stock Exchange. Because there was found an excision of some of the words of the original will the proceedings for probate were delayed and on August 20, 1929, the trust company named as one of two executors in the will was appointed temporary administrator of his estate. The will was probated on October 9, 1929, and on that date both the corporate executor and the individual executor received letters testamentary. Some three years later accountings of their respective proceedings were filed by the temporary administrator and by both executors. Objections made to the accounts by the widow, the sole beneficiary, raise the issues here for decision.

The will of deceased in clause third says: " I authorize and direct my executors to sell my membership in the New York Stock Exchange as promptly as possible after my decease and to pay the $10,000 gratuity fund attached to said membership to my wife, Katherine C. Pinney." " The power of a testator over his estate, the care and management as well as the ultimate disposition and distribution of it, is unqualified and absolute, save only as restricted and limited by statute." (*Hartnett* v. *Wandell*, 60 N. Y. 346, 349.)

" The intent of a testator as to how, when and by whom his estate shall be conserved, paid out and distributed will be, if needs be, strenuously searched for in the testamentary language and when ascertained will be carried out in so far as it is not inimical to law." (*Matter of Bergdorf*, 206 N. Y. 309, 312.) In a case dealing with an imperative power of sale vested in executors it was said respecting their failure to act: " They could not stand inert upon the plea that there should be no sale at all; they could not disregard an obligation to sell upon the plea that, although it is practicable, it should not be made at all, as it was not for the interests of all concerned. It is their duty to seek affirmatively for such time when a sale is practicable, considering in addition thereto, *but subordinate in its effect,* the interest of those to be benefited thereby." (*Walbridge* v. *Brooklyn Trust Co.*, 143 App. Div. 502, 507.) At least in a case of a testamentary trust no assent of beneficiary and no combination of trustee and beneficiary can destroy the trust and defeat the direction of the testator. (*Matter of Wentworth*, 230 N. Y. 176.) Here the direction of the testator was made in respect of a matter wholly within his right to decide and his direction to make a sale was binding upon his executors. When they assumed the office of executors they undertook the affirmative duty of making the sale.

When deceased died his stock exchange membership in question was worth $395,000. During the period of temporary administration its value fluctuated between $450,000 and $500,000. After the executors qualified further fluctuations occurred. Memberships sold at prices between $400,000 and $425,000 during the balance of the year 1929. They declined in value to less than $400,000 in January, 1930, and then rose gradually to a high of $480,000 through February, March and April. In June, 1930, a decline set in which by September, 1930, brought the price down to approximately $300,000. At the time of the account, which was September, 1932, membership in the exchange was quoted at only $185,000.

Here there has been absolute disregard of the mandatory direction of the testator. Is the resultant loss to be borne by the executors or by the widow of deceased?

Membership in the New York Stock Exchange is not transferable as of course by the holder. It is a privilege or right of which the value can be realized only in conformity with the rules of the exchange itself. Until the realization of that value, this membership remained a wholly unproductive asset. Nothing could be done with it which would profit the estate. No one could be given a temporary right to use it. No income could be derived merely from its existence as an asset. The record shows that it was

subject to abrupt and violent fluctuations in realizable value. Not only was the value attributable to it large in itself but that value constituted practically the entire estate of deceased. It could not be transferred to the widow who was intended by deceased to have its value. No one could do anything with it or about it except the authorized representatives of deceased's estate, and they could do nothing with it but sell it. For every reason which should actuate a person of ordinary prudence the asset was one which should have been realized upon as soon as the necessary steps could be taken for that purpose. Every day of needless retention of the asset was a gamble with the value that might be realized therefrom. Every day of such delay meant a loss of the income which such value, when reinvested, would have produced. Every day of delay was a direct violation of the lawful mandate in the will and was a violation of the fiduciary duty assumed by the representatives of the estate.

During the period of temporary administration deceased's widow demanded that the seat be sold. To this demand the reply was made that sale by a temporary administrator was impossible. That reply was apparently based upon advice given to the fiduciary by its attorneys. Such advice was erroneous and was given without inquiry at the office of the secretary of the stock exchange. Had such inquiry been made, or had the authorities been searched (*Matter of Grant*, 132 App. Div. 739), the error would not have been made. There was no reason why the corporate fiduciary should not itself have made inquiry at the stock exchange — but it did not.

The corporate temporary administrator was later appointed one of the executors. It cannot disclaim as executor the knowledge which it had acquired as temporary administrator. The same trust department and the same trust officer were in charge of the matter during the period of temporary administration and (at least for a considerable time) during executorial administration. In such circumstances, the corporate executor is chargeable necessarily, as executor, with notice of the facts which came to its attention as temporary administrator. Among those facts were the violent fluctuations in the value of this asset, the peculiar nature of it, the inability to realize any income from it until it was sold and the proceeds reinvested, and the desire of the beneficiary that it be sold. When this fiduciary qualified as executor it was then charged with the knowledge that the testator had directed the immediate sale of the membership. In taking letters testamentary it assumed the affirmative duty to carry out the lawful mandates of the will. The individual executor by qualifying as such assumed the same duty.

The lack of action in effecting a sale is predicated only upon erroneous advice so far as the period of temporary administration is concerned. That advice, while erroneous, explicitly informed the corporate fiduciary that an executor had full power to sell. Following the issuance of letters testamentary, there is no explanation for the delay in making the sale except a willingness to gamble with the price of the membership. Every day that passed without action was a direct flouting of the mandate in the will; was a waste of assets of the estate; and put the estate principal at hazard. The effect of this flouting of the mandate of the testator, this gambling with the assets of the estate and this delay in pursuing the course which ordinary business judgment would hold imperative, is that substantially all of the capital value in this estate has been lost. With it has been lost all of the income for a period of six years which, in ordinary course, and on a capital long realizable for this estate would have amounted to more than $100,000.

To the charge of mishandling of the estate made by the beneficiary, the executors plead estoppel and consent by her. Mismanagement is conceded. Loss is conceded. Violation of the mandate of the will is conceded. The only question here is whether or not these executors who have so failed in their duty may escape responsibility for the failure.

There is no basis to the claim of estoppel, if that defense is to be considered in its original aspect and meaning. There is here no fraud and no concealment. The beneficiary did not mislead the executors to their detriment. Here the executors were fully aware of all the facts. They were not barred from action in respect of this asset. Indeed, they were — and knew they were — the only persons who could act at all. If they chose to act they could not be stayed and knew that they could not be stayed. Everything that they did was voluntary and was done with full knowledge of the facts. Nothing was enforced upon them. Basically, their defense is not one of true estoppel but one loosely described as estoppel, though it means nothing more than assent to their conduct by the party now seeking to criticize it. Looked at in this aspect, two questions arise respecting this defense. The first is whether the facts support the claim of assent. This is sharply contested. The second is whether, in the circumstances concededly existent here, such a defense should be admitted as valid.

This defense of consent on which the executors rely is in effect that the widow of deceased, and his sole beneficiary, took charge of the matter of the sale of the stock exchange seat, that she, with an experienced member of the stock exchange in whose office deceased had had desk room, undertook to say when the seat should

be offered for sale and at what price, and that the executors exercised no judgment or discretion in the matter but turned over to her the management of the estate. The extensive record upon the hearings of the objections is occupied with testimony offered in support of that position.

It is established beyond doubt that following the death of deceased in June, 1929, and down to the probate of his will the beneficiary urged a sale. The failure of the corporate executor in its capacity as temporary administrator to take the steps necessary to enable it to sell has already been commented on. It should be noted here that the questions which were delaying probate had no relation to the terms of the will so far as they are here important. The excised matter had to do with a bequest in the will of an amount which was relatively small. The mutilations complained of were not such as to bar the will from probate. It was known that probate would immediately follow the return to this country of the draftsman of the will who chanced to be abroad when deceased died and who could prove what had been the text excised from the original will.

Immediately following the executors' qualification, they could have realized upon the membership, if they had sold it, a very large excess over the value of the membership at the date of death of the deceased. Their handling of it then (if they can be said to have done anything affirmative at all) can be catalogued more accurately as an effort to get a particular price than as an effort to sell. They had no obligation to obtain a particular price. It was mandatory under the terms of the will that they should sell. Nothing excuses their failure to sell immediately upon qualification. Whatever ascertainment of *modus operandi* was required could have been learned before the probate decree was entered. They could have been ready to sell at once upon qualifying. They did not sell. Later, in the spring of 1930, when they had watched for months the gyrations of the market value of this asset which the will commanded them to sell, they still could have obtained a very substantial sum in excess of the appraised value of the membership at the date of death of deceased. They did not take this opportunity. Instead they tried to get $500,000 for the membership and made no effort to sell it at the market.

The executors say that the widow of deceased insisted that they try to get the $500,000 and that they merely assented to her wish in that respect. Passing for the moment the question whether any such fact has been established, it is clearly proved that in the spring of 1930 the executors communicated with the beneficiary and asked her opinion as to a sale at the then market and that they then received her assent to a sale at $440,000 to $450,000. Having the

duty to sell because of the terms of the will, having the duty to sell because (irrespective the will) common sense and ordinary business judgment dictated it and having now the express assent of the beneficiary (whose wishes they assert they were following theretofore) the executors did not sell but did the extraordinary thing of removing the membership entirely from the market. Thereby they prevented a sale at a price which they knew the beneficiary had accepted. Further, they prevented a sale at the price at which they had listed the seat for sale during many previous weeks.

The corporate executor says, in effect, that this withdrawal was the act of its coexecutor and it intimates that it must have been at the wish of the beneficiary, expressed to the coexecutor either by her personally or by this adviser of hers to whom reference has heretofore been made. There is no support for this suggestion to be found in the record. If the corporate executor had made a further blunder of turning over to the individual executor every vestige of control of this valuable estate and had withdrawn from any contact with the estate, it cannot be excused for that reason. If by so doing it permitted its coexecutor to commit a grave blunder, it must suffer for his act.

This indubitable exercise of authority over the terms of sale of the seat in the spring of 1930 disproves the claim that theretofore the management of the estate had been taken out of the hands of the executors by the beneficiary. It furnishes a standard by which to test the defense that generally the executorial functions had been assumed by the beneficiary. These happenings negative that defense. The withdrawal of this membership from the market in the spring of 1930 was the act of the executors solely. It was done not only without request of the beneficiary but contrary to the assent which the executors had obtained from her that the membership then be sold.

It may be argued that the assent given then by the beneficiary was not an unqualified assent. It seems to the court that it was unqualified but even if a different interpretation is to be given to it these executors are in no better case. They had actually put the seat up for sale at a price, either with or without the assent of the beneficiary. If they had put it up with her assent they had not obtained from her any cancellation of her assent, because her communication is certainly not a cancellation. Her letter will not bear any interpretation that it is a direction to withdraw the membership from the market. Yet, the executors did withdraw it. If, therefore, they sought and relied on her assent they should have sold. Contrariwise, if they did not seek her assent before offering the seat their whole defense collapses. If they sought and

got her assent to a sale they took full responsibility when they withdrew the seat from sale and can no longer rely on their defense.

Later, when the membership was replaced in the market, the executors renewed the effort to get a price in excess of the market. Repeated failures had taught them no lesson. No one ascribes intentional wrongdoing to them. On this record it seems probable that the individual executor was inspired only by the motive to get for the widow of his friend the maximum obtainable. The complete quiescence of the corporate executor at this period permits no ascription to it of any motive. It just did not function.

Later, when the gamble in this estate asset had become indubitably a losing one, there began an interchange of communications characterized properly by the referee as self-serving. Then there began the erection of a defense against the claim of mishandling of the estate. From that point on, little dependence can be put in the writings of any of the parties. When this certainty of loss had developed, the trust officer theretofore in charge of the estate for the corporate fiduciary was relieved. In measuring the extent to which credit should be given to the defense now made that the beneficiary took over the management of this estate and relieved the executors from responsibility therefor it should be noted that she testified to definite occasions when she told this trust officer that she wanted the seat sold and the estate closed. She quotes him explicitly as telling her (what undoubtedly was the law) that the management of the estate was in the hands of the executors, that they had the right to determine when and at what price they would sell the seat, and that she had no right to dictate to them. That testimony stands wholly uncontradicted in this record. There is no reason to doubt its truthfulness. The trust officer in question was living at the time of the hearing and was still in the employ of the trust company. He could have been made available in person to testify, had his presence been desired by the executors. While he was outside the State of New York, his deposition could readily have been taken. The non-production of his testimony must militate seriously against the defense of its conduct now made by the trust company.

There would be great danger of abuse if any general principle were established that a beneficiary might not communicate with the representative of an estate respecting the administration of it except on the hazard of being charged with having assented to any course of conduct which the fiduciary thereafter chose to follow. There is a legitimate area within which beneficiaries may confer with fiduciaries. The latter are handling the funds and the property rights of others and within reasonable limits should make

available to beneficiaries information as to the course of administration. Such inquiries expose the beneficiary to no liability whatever. They do not involve the beneficiary in the estate administration and this is so even if there be an expression of viewpoint by the beneficiary. It is only where there is an absolute assumption by the beneficiary of the fiduciary's functions, under conditions which on general legal principles impose responsibility for the result, that a fiduciary should be permitted to defend the failures of his administration by charging them to the beneficiary. Any other administrative policy would be sure to result in grave harm. A lowering of the bars to this type of defense would undoubtedly result in escape from liability by unfaithful fiduciaries. The charge of interposition by the beneficiary is easily made. There is usually at least a shadow of basis for the statement that the beneficiary did seek information and did express an opinion about what should be done. The court should not aid escape from responsibility by reason of an entirely normal exhibition of interest by one whose property rights are under administration. The honest struggle of fiduciaries with the difficulties in the administration of estates arising out of the unprecedented conditions of recent years invokes the sympathetic interest of the court, but that sympathetic interest and that willingness to make full allowance for the difficulties of administration is not a cover for non-performance of fiduciary duty clearly indicated. Here there is no factual support for the defense urged by the executors.

There is a claim here of defense because the beneficiary executed to the attorneys for the estate a power of attorney to represent her individually. These attorneys wrote letters which are in evidence as petitioner's Exhibits 20 and 21. In them they make it clear that in the handling of estate affairs they acted only incidentally for the benefit of the beneficiary. The actual fact is shown upon this record that neither the attorneys nor the beneficiary interpreted this instrument as authorizing the expression by the attorneys of the beneficiary's attitude concerning the administration of the estate. On the contrary, the record shows that throughout the beneficiary was asked personally to express her viewpoint. It is established clearly that the attorneys did not purport to represent her or to act for her in respect of the disposal of the stock exchange membership.

Notice should be taken of the letter in evidence as petitioner's Exhibit 59, which authorized explicitly the retention of the stock exchange membership by the executors. The genesis of this letter is not of major consequence. Whether it was conceived as a cover for past maladministration and whether it was intended as a trap

for the beneficiary into which it was hoped she would fall and thereby lose her right to criticize the past acts of the executors, the fact is that it did not deceive her. Her footnote to it is an integral part of it and clearly left her in a position to criticize the preceding administration of the estate. It was signed and the footnote to it was written by her with full knowledge of the facts. She knew from its very text that the executors intended thenceforward to rely upon her specific assent to their holding of the membership. It constitutes a true estoppel against charges of loss occurring after the date of the letter because to permit the withdrawal of the assent contained in the letter would work the equivalent of an actual fraud upon the executors.

Argument might be made that a beneficiary should not be forced to make the choice between straight reliance upon legal rights and the forthwith signing of a consent such as this letter imports. In fairness to the beneficiary, she was at that point entitled at least to a suggestion by the executors and their counsel that she get independent advice. However, she chose to act without advice and her choice was undoubtedly a free choice. She should be held to the terms of the letter since its signing did in fact govern the executors' future course. They at the time were free to limit their liability to the loss then actually suffered. The circumstances make it plain that they put before the beneficiary their intention to limit that loss and to limit the basis of any criticism of their conduct to the conditions then existing. The losses suffered since the date of that letter of the beneficiary could have been avoided but for her signing of petitioner's Exhibit 59. The executors, therefore, may not now be charged with the loss of value in the membership occurring since its date. The executors are not by reason of that exhibit justified in their holding of the asset. They merely escape liability for losses occurring after the date of the exhibit solely because of the estoppel operating against the beneficiary.

It might be argued that the filing of objections to the account was a withdrawal of the consent theretofore given to hold unsold the exchange membership. That suggestion is without merit. The objections were a sweeping charge of malfeasance by the executors. The objections ignored the tenor and effect of petitioner's Exhibit 59 and on the hearings its procurement was asserted to be an evidence of fraud on and oppression of the beneficiary. In such circumstances the executors continued to have the benefit of the consent. When, if at all, the consent is in terms withdrawn the executors will lack excuse for further delay in liquidation.

The rule for liquidation of an asset such as this exchange membership was stated in *Matter of Hearns* (214 N. Y. 426), where the Court of Appeals affirmed a time limit of ninety days placed by the surrogate as the limit for action by executors in a similar situation. This rule, though made in another decade, is applicable here. Ninety days had elapsed on January 9, 1930. The membership should have been sold by that date. The next sale after that date was on January 16, 1930, at a price of $398,000 (objector's Exhibit 71). That is the sum with which the executors would be chargeable if it were not for the signing of petitioner's Exhibit 59 which reached the executors on November 7, 1930. The effect of that exhibit has already been stated and the executors are entitled to credit against the $398,000 referred to of the sum which the seat was worth on November 7, 1930. This is shown by objector's Exhibit 71 to be $230,000. The difference, $168,000, will be charged to the executors together with four per cent interest thereon from January 16, 1930, to the date of the decree. They will also be charged with the stock exchange membership as an asset still on hand subject to further accounting.

The exceptions to the referee's report are sustained in the particulars stated. In all other respects they are overruled.

Submit, on notice, decree modifying the report of the referee and settling the account accordingly.

(Opinion on amendment of decision, October 3, 1935.)

The attention of the court has been called to the fact that in the decision heretofore filed the time for liquidation stated in *Matter of Hearns* (214 N. Y. 426) was referred to as a period of ninety days, whereas that case adopted a sixty-day period. This error requires amendment of the decision heretofore made. The sixty-day period expired on December 9, 1929, at which time stock exchange memberships were selling at $425,000. This is the basic figure upon which the surcharge is to be computed. The finding of surcharge is amended accordingly.

The referee's fee has been fixed. In the exercise of discretion the court will make this fee a charge upon the estate. While the executors have been held responsible for a large surcharge, they successfully resisted an attempt at a much larger one. Likewise, in the exercise of discretion and because of the findings of negligence and maladministration by the executors, commissions will be denied them.

Resubmit, on notice, a decree in conformity with the original decision as modified hereby.