In the Matter of the Estate of MARTIN MERZ, Deceased.

Surrogate's Court, Chautauqua County, September 8, 1937.

*J. Russell Rogerson* appears in person and by *Sidney T. Hewes* and *J. Howard Peterson* of counsel.

*Herrick & Leet*, attorneys, in person, by *Ernest D. Leet* and *Gerald A. Herrick* of counsel.

*Myrtle Merz Maharon*, legatee, in person, and by *Joseph W. Kauffman*, her attorney.

*George Merz* and *Evelyn Merz Printz*, in person, and by *Ernest D. Leet*, their attorney.

*Warren M. Stone* appears of counsel, for Evelyn M. Printz.

*Mae Merz Barrett*, legatee, in person.

PATTERSON, Special County Judge, Acting Surrogate. This proceeding was commenced by citation to have a second intermediate account accepted as a final account and to determine the fees of the various attorneys. All matters in controversy have been settled except the fees which should be allowed to J. Russell Rogerson, who was retained as attorney for Myrtle Merz Maharon and Mae Merz Barrett, and of Herrick & Leet, who were retained as attorneys for George Merz and Evelyn Merz Printz.

Martin Merz died November 11, 1929, leaving a last will, which was probated November 27, 1929, on which date letters *c. t. a.* were issued to Union Trust Company of Jamestown. By the will of deceased one-third of the estate was devised and bequeathed to each of two daughters, Myrtle Merz Maharon and Mae Merz Barrett, and one-sixth each to George Merz and Evelyn Merz Printz, grandchildren. The will provided that an advance of $5,000 to Myrtle Merz Maharon during the lifetime of deceased should be deducted from her share of the estate. The will gave no authority to the executor over the real estate.

By inventory completed December 19, 1929, the personal estate of deceased was appraised at $121,537.16 as of the day of death. At different times before July 15, 1930, stock dividends were received by the administrator c. t. a. which were set forth in the first intermediate account at the value of $15,027.20, making a total appraised value of the personal property of $136,564.36. The debts of deceased at the time of death amounted to approximately $53,608.65. In addition to the above amount there were contingent liabilities of the estate on indorsements or guaranties by testator for Mrs. Maharon and Mrs. Barrett of something over $10,000. And also out of the estate would come the funeral expenses, expenses of administration and inheritance taxes.

On June 4, 1931, the administrator presented its first intermediate account. All of the legatees executed waivers consenting that the account be passed upon, settled and allowed by the surrogate, reserving the right to Mrs. Maharon, one of the legatees, to object to the enforcement of a $2,000 note and interest in the final settlement. A decree was made by the surrogate July 28, 1931, which, fortunately for the legatees, provided " that said intermediate account be duly filed as such in the Surrogate's office * * * and that the same be taken up hereafter and the final accounting be had thereon when the parties in interest so require." The account so passed upon listed debts not collected and securities unsold at $99,274.07, the various stocks being returned at the inventory value, or market price of those acquired after the inventory, and showed certain exchanges of securities by the administrator.

On October 15, 1931, one of the legatees, Mrs. Barrett, wrote to the administrator asking it not to sell any of the stocks belonging to the estate, saying that the heirs would prefer to pay interest on any indebtedness. As a result, an agreement was entered into on October 20, 1931, between the administrator and all of the legatees, which recited that the stocks were quoted very low and that the parties had theretofore agreed verbally that none of the stocks might be sold except to pay a portion of the debts, until such time as all of the heirs should agree to and request such sale or until the court should so order, and it was agreed therein that " said verbal agreement shall continue as to all the remaining stocks unsold, until said estate be settled."

On June 29, 1932, the administrator presented a petition to mortgage two of the parcels of real estate, stated therein to be worth at that time the sum of $33,000, reciting that the stocks listed were quoted at such low figures that they should not be sold to pay debts, and if so sold would not be even sufficient for that purpose. This petition listed the negotiable securities and gave the then present

value of the same at $12,859. It also listed certain other assets as being non-marketable and not salable at that time, including therein out of a total of $12,500 of such other assets $12,000 which it asserted could only be collected against the legatees out of their legacies, making a total of good assets of the value of $13,359, against which the administrator held the note of deceased on which there was unpaid for principal and interest $18,368, and there were contingent liabilities of approximately $10,000 upon which the estate was liable. In July, 1932, Mrs. Maharon and Mrs. Barrett consulted J. Russell Rogerson in regard to the condition of the estate, showing to him the first intermediate account of June 4, 1931, and the petition to mortgage the real estate to pay debts; and as a result of several conferences Mrs. Maharon and Mrs. Barrett entered into a written agreement with said Rogerson, under date of August 8, 1932, in which agreement they were designated as the " clients " and Mr. Rogerson was designated as the " attorney," and which agreement provided as follows:

" That the clients hereby employ the attorney as their attorney, to prosecute and collect certain claim against the Union Trust Company, as administrator with the will annexed of the Estate of Martin Merz, deceased, for the improper handling of the funds of said estate. In consideration of the professional or other services rendered by the attorney and any other persons whom he may employ in or in connection with the prosecution of said claim, the clients agree and hereby bind themselves, * * * to pay unto the attorney, * * * a fee equal in amount to 33 1/3 percent of whatever sum of money or other evidence of indebtedness, or securities or property, or other thing of value which may be awarded or collected on account of said claim, the intent being that the attorney shall receive 1/3, which shall be inclusive of disbursements, and the client two-thirds, of any recovery or settlement in money or value of property turned over, whether by way of surcharge or otherwise, resulting from the improper handling of funds in the estate.

" It is likewise agreed that the attorney shall have control of the prosecution and settlement of said claim to final determination. The attorney agrees not to make any settlement without the client's consent."

Said agreement further provided that the clients would not revoke or abridge the rights and powers of the attorney thereunder and that the agreement should not be affected in any way by any revocation of the authority granted nor by any services rendered by others or by the clients, and further excepted from the agreement a $2,000 note signed by the client Maharon about thirteen

years previously and charged against her in the intermediate accounting.

Mr. Rogerson then consulted with the administrator in regard to the petition to sell real estate, and as a result the proceeding was withdrawn. He then drew the necessary papers to compel an accounting by the administrator, but upon its agreement to render an account the papers were not filed. On October 10, 1932, the administrator filed its second intermediate account as of September 1, 1932, which set forth property unsold and uncollected as follows, viz.:

| | | | |
|---|---|--:|--:|
| Stocks then valued at | | | $26,124 00 |
| Cash on hand | | | 288 02 |
| Note of Myrtle Maharon to testator dated August 9, 1920 | $2,000 | 00 | |
| Interest to November 11, 1929 | 1,110 | 67 | |
| Advanced by testator to Myrtle Maharon | 5,000 | 00 | |
| Four-month note of George L. Merz to administrator dated May 12, 1932 | 4,000 | 00 | |
| McLaughlin notes | 500 | 00 | |
| Total | | | 12,610 67 |
| Total value as alleged by said account | | | $39,022 69 |

Of those alleged assets the $2,000 note and interest was claimed by Mrs. Maharon to be outlawed. And the $5,000 advance to her was not an asset. The direct liabilities against the estate as of September 1, 1932, were set forth as being a note of testator with interest amounting in all to $18,276. In addition it set forth that the estate was liable as indorser on a note of Mae Merz Barrett for $5,000 plus interest, and contingently liable on a mortgage guaranteed by testator and Mrs. Maharon and Mrs. Barrett for $5,000. This made total claimed liabilities of the estate of $28,676.

Mr. Rogerson, on behalf of his two clients, presented fifteen objections to the account, alleging negligence in not selling the stocks when they should have been sold, making illegal exchanges of securities, failure to pay debts, and other objections, by which the estate had suffered loss. He examined the officers of the administrator in that proceeding and laid the foundation for the trial of the objections. He obtained an order from the surrogate certifying fifteen questions to be answered by a jury in Supreme Court, all relating to whether the administrator was negligent in failing to sell particular stocks and to the prices at which it should have

sold them. The administrator appealed to the Appellate Division from the surrogate's order, and the order was affirmed. Trial was had in Supreme Court commencing February 4, 1935, and ending February 11, 1935. The jury rendered its verdict, holding the administrator negligent in failing to sell each of the fifteen stocks and certifying that they should have been sold for $99,642. After crediting the administrator with the sum of $17,081.32, theretofore received from the sale of part of those stocks, the sum of $82,560.68 was chargeable to the administrator as having been received on or about July 15, 1930, as the result of the finding of the jury.

A motion to set aside the verdict was denied by the presiding justice after a hearing. An appeal was then taken to the Appellate Division, where the judgment was affirmed by a three to two vote (246 App. Div. 889); appeal as a matter of right was then taken to the Court of Appeals, which was dismissed on motion of objectors (271 N. Y. 522); application was then made to the Appellate Division for leave to appeal to the Court of Appeals and to certify as to whether there was any evidence in the record to sustain the verdict of the jury as to the questions certified and to certify the additional question of whether the objectors or any of them were estopped as matter of law from asserting any claims against the administrator for its acts prior to May 27, 1931, both of which were granted. The Court of Appeals (October 13, 1936) sustained the verdict and answered the question of whether the legatees were estopped in the negative (272 N. Y. 524).

After the Court of Appeals decision in October, 1936, Mr. Rogerson held conferences with the administrator looking to a settlement, and was joined by Mr. Leet in behalf of his clients after November 1, 1936, and a tentative agreement was drawn up and approved orally by all of the interested parties except Mrs. Maharon on or about the 15th day of November, 1936. Numerous conferences were had between Mr. Rogerson and Mrs. Maharon thereafter in regard to that tentative agreement, and, aside from objecting to the same on account of the note given to the testator in 1920 and interest thereon, her only objection stated by her was that she wanted to make the bank go through the Surrogate's Court so there would be a record of the proceeding which her children could in after years see for themselves. Finally the second amended account was filed by the administrator with a petition that it be considered a final account, and the matter was returnable on April 2, 1937, and adjourned to April 9, 1937. On March 22, 1937, there was filed in the office of the clerk of the Surrogate's Court written retainer executed by Mrs. Maharon on March 19, 1937,

by which Joseph W. Kauffman was retained to represent her in all matters connected with said account, and also a notice of retainer executed by said Joseph W. Kauffman as attorney for Mrs. Maharon, and thereafter said Joseph W. Kauffman brought a proceeding to compel Mr. Rogerson to accept said notice of retainer. The matter came up in Surrogate's Court on the ninth day of April, at which time Mrs. Maharon went on the stand and testified that Mr. Rogerson was no longer her attorney, that she did not wish Mr. Rogerson to appear in her behalf in that proceeding or any proceedings, and that she wished Mr. Kauffman to represent her. As a result, the surrogate ruled that Mr. Rogerson was relieved from any further responsibility for the legal conduct of the affairs of Mrs. Maharon and that Mr. Kauffman undertook that responsibility thereafter.

(1) A client is entitled to cancel his contract of retainer, with or without cause. But such an agreement cannot be partially abrogated. Either it wholly stands or totally fails. After cancellation, its terms no longer serve to establish the sole standard for the attorney's compensation. Together with other elements, they may, however, be taken into consideration as a guide for ascertaining *quantum meruit.* (*Matter of Montgomery,* 272 N. Y. 323; *Matter of Krooks,* 257 id. 329; *Matter of Tillman,* 259 id. 133; *Matter of City of New York,* 219 id. 192; *Martin v. Camp,* Id. 170, 174.)

It is claimed, however, that at the time of Mr. Rogerson's discharge as attorney by Mrs. Maharon the contract was so nearly completed that the original contract governed. This contention is based upon the language of the court in *Matter of City of New York (supra)* and the decisions in *Matter of Krooks* and *Matter of Tillman (supra).* In the *City of New York* case the court said, " under our recent decision in *Martin v. Camp,* the client has the right to end the employment at any time before complete performance." In *Matter of Tillman* the attorney had a contingent contract for three per cent of the proceeds of litigation which might be recovered against several insurance companies. After the client's right to recover had been established and the litigation was terminated except for computation by the referee of the amount due, the court below ordered a substitution of attorneys on condition that the client file a bond in a specified amount to pay his former attorney three per cent of such recovery as might be had. The order was reversed by the Court of Appeals and the matter remitted to Special Term with directions to fix the appellant's lien on the basis of *quantum meruit.* Nothing was said in the opinion upon the subject of complete or substantial performance. In *Matter of Krooks*

(*supra*) Conrad was retained by Jennie Krooks as her attorney in connection with certain condemnation proceedings and agreed to pay him all moneys in excess of $38,000, " which may be paid to me or my assigns as the result of said proceedings." The attorney performed his services with such energy and skill that the justice at Special Term stated in memorandum that the sum of $46,500 was awarded by him for the Krooks property. Two days after that memorandum was published Mrs. Krooks canceled her retainer and brought a proceeding to set aside the written agreement and to determine the attorney's lien. Without taking evidence of the value of the attorney's lien it was fixed at the amount " which may be paid as a result of said condemnation proceedings, over and above $38,000." The opinion in the Court of Appeals said (p. 332): " Assuming that the rule were to be narrowed to the extent of allowing cancellation only in those instances where the attorney's services had not been substantially completed [*Matter of City of New York,* 219 N. Y. 192, 194], it would now in this case require application." The court held that the services were not shown to have been so nearly completed as to preclude the client from the discharge of her attorney and the retainer of a different one, and reversed the lower courts and remitted the matter to Special Term to take testimony as to value of the attorney's services and to fix his lien. The court further said " the client's right to control her retainer does not permit her to cheat her attorney  *  *  *. If the attorney shall be paid the reasonable value of his services, no cheating will occur. The contract has been canceled and its terms cannot establish the standard for compensation."

Applying the rule thus laid down and assuming, without deciding, that his services must have been substantially completed at the time of his discharge (which has not been definitely decided), the court is satisfied that the contract of Mr. Rogerson was not substantially completed at the time of his discharge. He had established the negligence of the administrator and the fact that the administrator should have sold the stocks in controversy for $99,642 on or about July 15, 1930. This did not determine the amount of the surcharge. There still remained action by the Surrogate's Court to determine whether the bank was entitled to credit for the amount of $34,114.75, being the value of the remaining stocks on October 20, 1930, when the agreement between the administrator and the legatees was signed, under the doctrine of estoppel laid down in *Matter of Pinney* (156 Misc. 844), and, as ruled by the trial justice herein, whether the bank should be credited with the sum of only $23,124.50, which was the sum actually received

by the administrator for the remaining stocks and which was the figure used in the final settlement agreement herein, or what other basis of surcharge should be adopted. It was also still left to the Surrogate's Court to determine what rate of interest should be charged the administrator from July 15, 1930, upon the value of the stocks as fixed by the jury, and whether the administrator should be credited with dividends received since that date and in what amount and with what, if any, interest thereon. Also to determine all other matters embraced in the objections filed to the September 1, 1932, account; to determine whether the bank should be allowed any commissions and, if so, what; and also to determine whether the administrator should be denied costs or attorney's fees by reason of its negligence. From these facts it results that the services of Mr. Rogerson to Mrs. Maharon must be determined, not upon the contract between them, which has been canceled, but upon the basis of what they were reasonably worth.

(2) Section 276 of the Surrogate's Court Act provides as follows: " Except where special provision is otherwise made by law, costs, awarded by a decree or order may be made payable by the party personally, or out of the estate, or fund, or out of the share or interest therein of any person, or from both, in such proportion as the surrogate may direct, and justice requires."

Section 231-a of said act, which is relied upon by the claimants in this proceeding, provides: " At any time during the administration of an estate, and irrespective of the pendency of a particular proceeding, the surrogate shall have power to hear an application for and to fix and determine the compensation of an attorney for services rendered to an estate or to its representative, or to a devisee, legatee, distributee or any person interested therein; * * * The surrogate may direct payment therefor from the estate generally or from the funds in the hands of the representative belonging to any legatee, devisee, distributee or person interested therein."

And section 40 of said act provides in part as follows:

" General jurisdiction of Surrogate's Court. Each surrogate must hold, within his county, a court, which has, in addition to the powers conferred upon it, or upon the surrogate, by special provision of law, jurisdiction, as follows:

" To administer justice in all matters relating to the affairs of decedents, and upon the return of any process to try and determine all questions, legal or equitable, arising between any or all of the parties to any proceeding, or between any party and any other

person having any claim or interest therein who voluntarily appears in such proceeding, or is brought in by supplemental citation, as to any and all matters necessary to be determined in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires."

By section 276 very wide and specific powers are specifically given to the surrogate to award costs as justice requires, without regard to the relationship of attorney and client. No such broad powers are specifically given to award compensation under section 231-a, and it is necessary to determine the purpose and meaning of this section. Prior to the enactment of section 231-a in 1923, the Surrogate's Court had power to fix and determine the compensation of an attorney for services rendered to a representative of an estate under section 40 of the Surrogate's Court Act (WINGATE, S., *Matter of Anderson*, 136 Misc. 110), but had no jurisdiction to determine disputes between an attorney and client other than a representative. (*Matter of Parsons*, 121 Misc. 747; *Matter of Rosenberg*, 147 id. 517; affd., 241 App. Div. 601; *Matter of Matheson*, 265 N. Y. 81.)

In addition to incorporating into statute what had already been settled by judicial decisions with reference to fixing the compensation of attorneys for representatives, section 231-a, which conferred plenary power upon the surrogate to dispose of disputes, conferred upon this court power to determine disputes arising between attorneys and *beneficiaries* of funds administered in this court. (FOLEY, S., *Matter of Parsons, supra*.)

Commencing with *Matter of Parsons*, a long line of decisions, mostly by surrogates, has been handed down in which it is said that cases may occur where the services of an attorney for a beneficiary, resulting in advantage to the estate, may properly justify an allowance out of the estate generally, for example, where funds are recovered and the estate enhanced through the efforts of counsel for a beneficiary. (*Matter of Parsons, supra; Matter of Buttner*, 215 App. Div. 62; *Matter of Lounsberry*, 226 id. 291; *Matter of Vorndran*, 132 Misc. 611; *Matter of Hirsch*, 154 id. 736; *Matter of Winburn*, 160 id. 49; *Matter of O'Brien*, 146 id. 555; *Matter of Chaves*, 143 id. 872.)

In such a case it would be a hardship to compel the legatee or beneficiary with a relatively small share to pay out of it the entire charge for an attorney's services which resulted to the advantage of other legatees or beneficiaries. (*Matter of Chaves, supra*.)

SMITH, Richmond county surrogate (*Matter of Rosenberg, supra*), said (at p. 520): " The effect of section 231-a, in addition to making

statutory the power already possessed, was to give a surrogate the authority to direct compensation to be paid out of an estate to the attorney for a distributee, who:  *  *  *  2. Rendered services to a distributee which tended to bring into existence, produced or tended to produce assets that would enhance the value of the estate or would procure the restoration or delivery of property belonging to an estate;  *  *  *.  But before compensation can be decreed to be paid out of estate funds in any instance, the surrogate must be satisfied ' that the services be [have been] shown to have resulted in such an advantage to the estate that it would be unfair for the party to pay for them.' "

FOLEY, S. (*Matter of Chaves, supra*), said: " The exceptional cases, where an allowance out of the general estate is justified, are relatively few.  Where an attorney for one legatee or next of kin compels an accounting and secures the restoration of diverted funds *  *  *  he should be compensated out of the general estate restored through his efforts."

In only two of the cases which have been brought to my attention or which I could find, construing section 231-a have allowances out of the general estate been made under that section to attorneys for a beneficiary.  These were *Matter of Lounsberry (supra)* and *Matter of Hirsch (supra)*.

In both cases it appeared that property was returned or came into the estate through the efforts of an attorney for certain parties individually interested.  In *Matter of Lounsberry* the surrogate made a finding that the services were worth $400 and benefited the estate, but disallowed the claim upon the theory that the surrogate lacked the power to make the allowance.  The Appellate Division reversed the surrogate and ordered the amount paid, claiming to have authority under section 231-a to do so.  In *Matter of Hirsch*, WINGATE, S., said: " Here the main portion of the services for which recompense was sought were performed in the action in the Supreme Court, which, professedly and actually, was instituted and prosecuted and the results of which beneficially inured equally to every person interested in the estate of the decedent.  It follows that the estate as a whole received the benefit and should pay therefor."

No case has been brought to my attention which refused an allowance out of the estate under section 231-a of the Surrogate's Court Act where it appeared that the services rendered by the applicant attorney for a beneficiary resulted in bringing assets into the estate from which all parties benefited.  In no such case, however, where an allowance was made, did it appear that attorneys for other parties participated in bringing in funds to the estate.

It is claimed by the applicant Leet that the two grandchildren, his clients, were represented by him as attorney, and that, the relationship of attorney and client between them and Mr. Rogerson being absent, there is no authority under said section 231-a to make any allowance to Mr. Rogerson out of the general estate. This claim is based upon the language used in the following cases: *Matter of Parsons (supra)*; *Matter of O'Brien (supra)*; *Matter of Frame* (162 Misc. 34); *Matter of Winburn (supra)*; *Matter of Chaves (supra)*. In *Matter of Parsons (supra)* the attorney applying was unsuccessful in a contested will proceeding, and his services did not benefit any one. In *Matter of O'Brien (supra)* there was an application under section 231-a for an allowance, in addition to an allowance of costs made under section 278, to the attorney for a successful contestant in a probate case. The contest resulted in the applicant's client obtaining a one-fourth share of the estate at the expense of the proponents, who would have received the whole estate. It was held that the estate was neither increased nor diminished as a result of the contest, and the application was denied.

In *Matter of Frame (supra)* the petitioning attorneys sought to have their compensation fixed and payment directed out of the fund payable to the assignee of their former client, Pemberton Frame. In order to find what was involved in the decision in this case it is necessary to read the reports of various decisions in that estate covering several years of litigation. (*Matter of Frame*, 128 Misc. 788; affd., 234 App. Div. 748; 238 id. 811; 152 Misc. 475; affd., 245 App. Div. 675; 162 Misc. 34.) It appeared that five grandchildren were each given a trust fund of $50,000 under the will of deceased. The services were rendered by the petitioning attorney to Mrs. Sterling, one of the grandchildren, on the accounting, and the other four grandchildren or assigns, one of whom was the respondent, whose interests were identical, were represented by their own attorney. Generally speaking, the services were rendered on the accounting, and a decree of surcharge was made against the executors. This decree in no kind affected any of the grandchildren, but inured to the benefit of others interested in the estate. FOLEY, S. (162 Misc. 34, at pp. 35, 36), said: " In the pending proceeding it appears that the assignee was represented by his own attorney throughout all of the proceedings for which compensation is sought by the petitioners. The latter assert that their services in some way resulted in advantage to the respondent. He, however, never retained them nor recognized their right to represent them. * * * The assignments made by the former **client** * * * in 1929 of his entire interest in the estate were,

in effect, a formal discharge of his attorneys. Thereafter, their right to look to the fund as a source of payment for any future services was terminated. Whatever services were rendered subsequently by the petitioning attorneys were plainly rendered for the benefit of their remaining client, * * * whose status as a person interested in the estate was substantially similar to that of her brother, Pemberton Frame. The protection of the rights of the assignee was left to his own attorney. It is the general and unquestioned rule in this court, as in other courts, that each individual client should pay his own attorney and that an attorney cannot make another person his debtor by voluntarily rendering services * * * without his express or implied assent." In that case the surrogate had already reiterated the doctrine that where funds were brought into the general estate as a result of the attorney's efforts he would be compensated out of the general estate, but the effort was not to get funds out of the general estate but out of one individual party who was represented by his own attorney.

In *Matter of Winburn (supra)*, FOLEY, S., said (at p. 56): "No court has ever held that, aside from the award of statutory costs and allowances, the charge of an attorney for a successful party could be imposed directly upon the shares of other parties similarly situated because of their individual rights. The effect of such an attempted charge here would be to impose by judicial fiat the relation of attorney and client where no contract, express or implied, nor any agreement of hiring ever existed." In the opinion in that case the surrogate had previously restated the law to the effect that an attorney could be compensated where his efforts had resulted in increasing the general estate and all the other beneficiaries profited. It further appeared that certain of the distributees suffered a loss of several thousand dollars as a result of the conflict. The surrogate further said: "There is not the slightest indication, however, in the context of the section of any legislative intent that the charges of the attorney for one individual party, whether legatee or distributee, should be paid out of the shares of other individual parties. Such is the situation here. No funds were brought back into the estate as in a surcharge case. The dispute only arose as to testacy or intestacy."

Considering the *purpose* of enacting section 231-a of the Surrogate's Court Act as interpreted by the various decisions above as being: (1) To incorporate into statute what had already been determined by judicial decision with reference to fixing the compensation of attorneys for *representatives;* (2) to confer power to

determine disputes arising between *attorneys* and *beneficiaries* of funds administered in this court, and which *purpose* has been extended as herein noted by judicial decisions to cover cases where an attorney for one party renders services which result in bringing funds into the estate and seeks an allowance out of the general estate, although the relation of attorney and client is not present; and considering the reason given for assuming such additional power which is that it would be unfair to make one party stand the whole expense of bringing such funds into the estate, is there any power given specifically by section 231-a or by section 40 which would permit the surrogate to use his discretion so as to make such a decision " as justice requires? " It seems that if it were intended. by this section that the court could fix the proportion to be paid by the various parties, " as justice requires," as is the law relating to costs under section 276, the language would be as broad as that of section 276 of the Surrogate's Court Act. And I do not believe that any powers given by section 231-a can be increased by the language of the introduction to section 40. Further, it is to be noted that the reason given by the decisions for extending authority under section 231-a, " that it would be unfair to make the successful contestant stand the entire expense of the litigation," is for the benefit of the client and not for the attorney. Any payments made to the attorney out of the general estate would naturally reduce the amount payable by his client.

If the court were given power under section 231-a of the Surrogate's Court Act to make a combined charge against the estate and to allocate to each attorney the amount which in the discretion of the surrogate should go to each for their services to the estate and what should go to them for their services to their own clients, this court could render a decision very easily which he felt would do justice to all the attorneys and to the clients involved.

To Mr. Rogerson must be given the credit for bringing into the estate $71,623.66. Without his having interposed objections and successfully carrying them through without help from Herrick and Leet in so far as the negligence of the administrator and the fixation of the price at which stocks should have been sold was concerned, no part of this sum would have been distributed to any of the legatees. The preliminary examination of the officers of the bank by Mr. Rogerson, in which Herrick and Leet took no part, contributed in large measure to the result on the issue of estoppel raised by the bank, not only as affected by the waivers to the first intermediate account and the agreement between the legatees and the administrator under date of October 20, 1931, but also as to

the claimed acts of estoppel otherwise by Herrick and Leet's clients. And upon the trial and upon the various appeals comprehensive briefs were filed and arguments made by Mr. Rogerson covering not only the waivers and agreements above mentioned but also the acts of Mr. Rogerson's own clients claimed to estop them. An examination of the briefs of Herrick and Leet submitted on the appeals shows that so far as the issues of estoppel were directed against the said waivers and agreement, they were largely a duplication of the briefs filed by Mr. Rogerson, even as to the cases cited. This court feels that the major credit for the result of said issue of estoppel in so far as the same concerns the waivers and agreement aforesaid, must be given to Mr. Rogerson. It cannot be said or determined what proportion of such credit should be given to Herrick and Leet. In other words, Herrick and Leet can be given credit for only a portion of the result so far as the issue of estoppel is concerned, and what, if any, portion is purely speculative.

The court, therefore, finds that there is no power given to it to make an allowance to Mr. Rogerson out of the general estate. If the law were otherwise, the court would, in the exercise of its discretion, make an allowance to Mr. Rogerson out of the share of Herrick and Leet's clients. The result, so far as Mr. Rogerson's clients are concerned, could have been mitigated if a decree had been granted herein upon the accounting, as the court could have made an allowance to them as *costs* under the provisions of section 276 of the Surrogate's Court Act at the rates prescribed by section 278, and which could have been made payable to them from the administrator or from the general estate or from the interests of any party or from both in such proportion as justice required.

There remains, therefore, for determination by this court the amount that shall be allowed Mr. Rogerson from the share of Mrs. Barrett under the retainer agreement, and the amount that shall be allowed to him out of the share of Mrs. Maharon, to be determined upon the basis of what his services were reasonably worth.

The retainer agreement between Mrs. Barrett and Mr. Rogerson was to prosecute and collect a claim against the administrator for the improper handling of the funds of said estate. In order to ascertain the base upon which the thirty-three and one-third per cent provided for in said agreement shall apply, it is necessary to determine, first, the part of the sum which Mrs. Barrett became entitled to under the settlement agreement with the administrator which was traceable to the improper handling of the funds of the estate, and then to determine the amount to be deducted therefrom as being the condition at which the administrator sought. to

have its account settled after the retainer. The following shows the part of the settlement agreement which is attributable to the efforts of Mr. Rogerson under said retainer agreement:

| | |
|---|---:|
| Value of stocks as fixed by jury | $99,642 00 |
| Interest at four per cent thereon from October 1, 1930 | 21,665 79 |
| Brokerage and transfer charges on sale of stocks paid by administrator but for which it was not allowed credit | 292 33 |
| Received from reduction of interest on testator's note from six per cent to four cent from October 1, 1930 | 2,541 67 |
| Gain in reduction of administrator's commissions from $1,490, earned at time of 1932 account, to $798.39, allowed on the settlement | 691 61 |
| Total | $124,833 40 |

Less amounts credited to administrator on settlement:

| | | |
|---|---:|---:|
| Previously received from sale of part of stock | $17,081 32 | |
| Dividends received since July 15, 1930 | 7,229 42 | |
| Interest on dividends | 1,275 00 | |
| Total | | 25,585 74 |
| Balance | | $99,247 66 |
| Deducting the value of the stocks as set forth in the September 1, 1932, account, to wit | | 26,124 00 |
| Leaves a balance of | | $73,123 66 |

As there was an allowance of $1,500 in the final settlement for attorneys' fees to administrator, that sum must be also deducted, as there is no proof as to what would have been allowed on the judicial settlement of the 1932 account if no objections were filed. This leaves a net balance of $71,623.66 which I find to be the net benefit to the estate itself from the services rendered by Mr. Rogerson. There were other advantages and benefits received by certain of the parties by way of reduction of the rate of interest from six per cent to four per cent on their individual indebtedness to the administrator bank and the benefit which all parties received by having the administrator bank manage the real estate and collect

the rents during all these years without any compensation except the sum of about $496 which it had received as commissions at the time of the September 1, 1932, account. I do not think these additional advantages are covered or are a part of the base upon which Mr. Rogerson's services are to be computed. Computing the one-third interest of Mrs. Barrett in round numbers as being the sum of $24,000, I find and decide that Mr. Rogerson is entitled to the sum of $8,000 from the share of Mae Merz Barrett in said estate and to a lien upon the same for his services as determined by said retainer agreement.

In determining what Mr. Rogerson shall receive from Myrtle Merz Maharon for his services to her, it must be determined upon *quantum meruit*, or for what they were reasonably worth. The court should consider the time spent, the difficulties involved in the matters in which the services were rendered, the nature of the services, the amount involved, the professional standing of the counsel, and the results obtained. (*Matter of Potts*, 213 App. Div. 59.) And in such determination the court can take into consideration the fact that the services were rendered upon a basis contingent upon success and also consider the percentage fixed in the retainer agreement which was canceled by Mrs. Maharon. In this matter the testimony of Mr. Rogerson is that he himself spent over 150 days in the hearing, preparation, trial and appeals in the matter. There can be no question of the fact that to most attorneys the prospects would have looked hopeless at the time Mr. Rogerson was retained, and the difficulties involved were concededly great especially in view of the opposing attitude of the parties other than his clients. The nature of the services has been described herein. The amount involved was great, and if failure had attended his efforts the interest of the parties in the real estate would have been subjected to the indebtedness of the parties, for little would have been left for the parties out of the personal assets of the estate, and, in fact, none at all for Mrs. Maharon, if no objections had been made to the account of September 1, 1932. On the contrary, she would have still been liable in a considerable amount to the bank. There can be no doubt as to the high professional standing of Mr. Rogerson, and it has been testified herein that he and one other were the two best attorneys in the city of Jamestown, and it was so conceded by Mrs. Maharon. As to the results obtained, Mrs. Maharon has her interest in the real estate released from any claims to the administrator bank, became entitled to approximately $24,000 which she would not have been entitled to if Mr. Rogerson had not been successful, and in addition has had the services of the administrator in collecting rents and managing the real property during all these

years with practically no compensation, and had the interest on her contingent liability to the bank reduced from six per cent to four per cent. Taking into consideration the retainer agreement which she had with Mr. Rogerson and the obstacles which had to be overcome by him and which could not have been foreseen at the time the agreement was entered into, and the large disbursements which Mr. Rogerson incurred for counsel fees and other expenses, together with the other facts herein set forth, it seems that Mr. Rogerson should receive a higher allowance for his services than would have been the case if the retainer agreement governed as to his charges against Mrs. Maharon. The court finds and decides that Mr. Rogerson is entitled to the sum of $10,000 from the share of Myrtle Merz Maharon in said estate, and to a lien upon the same for his services, which allowance includes one-half of the disbursements he has actually made as testified to by him.

There remains the question of the amount of allowance to be made to Herrick and Leet as attorneys for George Merz and Evelyn Merz Printz. Two witnesses have testified the services rendered by them were worth between twenty-five and thirty per cent of the amount recovered for their benefit. Their services were not rendered on a contingent basis. They had nothing to do with establishing the negligence of the administrator. The hypothetical question put to those two witnesses by Mr. Leet assumes " the services of Ernest D. Leet in his participation in said trial and in the filing of briefs were directed primarily to obtaining a favorable finding of the jury and of the Appellate courts on this issue of estoppel." Certain of the services, such as opposing the jury trial, did not turn out to be a benefit to their clients, and only served to obstruct the proceedings taken by Mr. Rogerson. Taking these facts into consideration, together with the fact that the base or amount of benefit received by their clients is not limited under a retainer agreement or hiring, as was the fact as far as Mr. Rogerson is concerned, while the court cannot accept the testimony of the two witnesses as to the percentage to be allowed, it is decided and found that the services of Messrs. Herrick and Leet were reasonably worth the sum of $5,000, one-half of which is a lien against the funds held by the administrator for George Merz, and one-half a lien against the funds held by the administrator for Evelyn Merz Printz, said sums to include the disbursements made or incurred by Herrick and Leet.

The amounts herein fixed as being payable to the different attorneys are subject to the amounts already paid thereon pursuant to the settlement agreement between the parties.

The decision herein rendered as far as it affects Mr. Rogerson and Myrtle Merz Maharon is very unsatisfactory to the court and undoubtedly will be to them. If it were left to the discretion of the court and the court was not limited by law, the allowance to Mr. Rogerson would be greater and that against Mrs. Maharon would be less, and Herrick and Leet's clients would have been required to pay a just proportion of the amount recovered, especially in view of the fact that, if Mr. Rogerson had not as a matter of courtesy allowed Herrick and Leet to take part in the trial and appeals, an allowance would have been made out of the share of the latter's clients. Enter decree in accordance herewith upon notice.